**CASTANIEN, ESTATE OF, In Re**

Probate Court of Franklin Co

No 82,226

Howard Heilman, Columbus.
Maynard Donaldson, Columbus.
Ray McFayden, Columbus.

## OPINION

By McCLELLAND, J.

This matter comes on to be heard upon the motion of Frank Marsh, an alleged creditor of the estate of Alfred Castanien, deceased, for an order to require the administrator to republish the notice of appointment, on the ground that the publication of said notice heretofore made was not in a newspaper of general circulation within the county.

The record in this case shows that two administrators of the estate were appointed and qualified on March 9, 1938. On the 9th day of March, 1938, the Probate Court gave notice that the administrators had been duly qualified in the estate of Alfred Castanien, and caused the said notice to be published in the Ohio Jewish Chronicle. On April 4, 1938, the Ohio Jewish Chronicle filed in this Court its affidavit of service, stating that the notice was published on March 18th, 25th, and April 1. 1938, in the Ohio Jewish Chronicle, a newspaper of general circulation in the county aforesaid.

The motion directly raises the question as to whether or not the Ohio Jewish Chronicle is a newspaper of general circulation within the county of Frank-

lin. This question has already been adjudicated by some of the courts of Ohio, the chief decision on this question being that rendered by the Common Pleas Court of Lorain County, April 22, 1911, in the case entitled **State ex rel Stevens, Pros. Atty. v Lorain Democrat Company, et al, 22 Ohio Decisions 267.** In this decision, which was affirmed by the Supreme Court, as indicated in **87 Oh St 467,** it was held that a news publication in the German language is a proper publication in which to publish the annual report of the County Commissioners as provided in the former statute No. 2508. The first syllabus of which is as follows:

" 'General' used in connection with the circulation of a newspaper refers to the character of a paper and the purpose of its publication, whether designed to represent some special interest, business, trade, society, religion, organization, or for the circulation of passing event, local and general news and items of common interest. Hence, a newspaper of 'general' circulation as prescribed by §2508, GC, is one devoted to matters pertaining to and of concern to the whole community and of public and common interest; its character is not determined by the extent of circulation through a given community."

Another adjudicated case is that of **State ex rel Sentinel Co. v Wood Co. (Combs)** reported in **Ohio Circuits at page 93.** This case was affirmed without opinion as indicated in **84 Oh St 447.** The third syllabus of this case is as follows:

"A newspaper having a circulation of 800 subscribers in a county of about 50,000 inhabitants, in fifteen of the twenty townships of which it had a circulation of thirty-six subscribers out of a population of 35,000 or more, and the remainder of its circulation being in a part of the county containing the other five townships, is a paper of general circulation within the meaning of §2508 GC. Parker, J, dissents."

In this case, an injunction was sought to prevent publication of a report of the county commissioners in the "Weekly Beacon," on the ground that it was not a paper of general circulation within the county.

Another important decision was one rendered by the Court of Appeals of the Third District, being that of **Huffman v State ex Dally, 20 Abs 378.** The question arose in a mandamus action by which it was sought to compel the county auditor of Hancock County to publish certain notices in the Hancock County Herald. The first syllabus of which is as follows:

"1. A newspaper of 'general circulation' is one devoted not to any single or particular object but to matters of public and common interest pertaining to and of concern to the whole community."

In the body of the decision we find the following language:

"The county auditor tenders the issue that the Hancock County Herald does not have a general circulation. It is admitted that The Hancock County Herald has an approximate circulation of 700 copies in the county; about 600 copies of this regular circulation are distributed in Portage, Pleasant and Blanchard townships, Hancock County, Ohio, and the remaining 100 copies are distributed in Liberty, Allen and Union townships and the city of Findlay; that the news, editorial matter and advertising published therein is of a general nature in the sense that it is not confined to the interest of any party, sect, trade, profession, class or order and is available to anybody and everybody in the county on the same terms and conditions.

"What is meant by the word 'general' in connection with the circulation of a newspaper? In the opinion of this court it may refer somewhat to the extent of its circulation through a given community. However, in the main, it refers to the character of the paper and the purpose of its publication,

whether designed to represent some special interest, business, trade, society, religion, organization or whether designed for circulation as the disseminator of intelligence or passing events, local and general news and items of common interest. A paper of general circulation is one not devoted to any single or particular object but is devoted to matters pertaining to and of concern to the whole community and of public and common interest. .

It is admitted in the presentation of the case, that the Hancock County Herald was published for general circulation to give the news of common interest to all persons who might care to take the paper." * . * *

In our opinion there is no better statement of the legal conception of the term "general circulation" than that contained in the foregoing excerpt.

In our investigation of this question, we find the opinion of Hon. Timothy S. Hogan, Attorney General of Ohio, rendered on May 24, 1912. This opinion was rendered to Hon. Samuel L. Black, Probate Judge of Franklin County, Ohio; the particular question being whether the Catholic Columbian, a newspaper printed in the City of Columbus, Ohio, was a newspaper of general circulation in the county. In that opinion, Attorney General Hogan held that the Catholic Columbian was a newspaper of general circulation within Franklin County, and fulfilled the requirements of the statute existing at that time. The writer of that opinion, in addition to quoting the Wood County case and the Lorain County case, also quotes from the case of Bigalke v Bigalke, 19 O. C. C. 33, as follows:

" 'Cleveland Daily Record' devoted principally to news of a legal character, Held to be a 'Newspaper' and publication of legal notices therein, complied with the law."

The question in that case was not whether it was a paper of general circulation, but whether it was a newspaper. It seems to have been admitted by all parties that the Catholic Columbian was a newspaper published largely for the purposes and in the interests of people of the Catholic faith. It had a circulation of approximately 50,000, and its circulation was not confined to members of the Catholic faith, but was one of general circulation within the county.

Our attention has also been called to the opinion by Hon. John S. Connor, rendered on September 17, 1897, to V. R. Shepard, Editor and Publisher of The Court Index, at Cincinnati, Ohio. Although this report does not have any value as a court decision, it contains an excellent discussion of the question now before the court, and has been very helpful to this court in deciding the question now before it.

Our attention has also been called to the case of Toledo v Babcock (1911) 14 O. C. C. N. S. 531, and 33 O. C. C. 29, in which the Court uses the following language:

"In determining the circulation of a paper within the meaning of the Ohio Statute that requires all publications to be published in a newspaper of general circulation, one was not limited to subscriptions paid in advance, but was limited only by the number of bona fide subscriptions."

In the case of Ambos v Campbell, 40 Oh Ap 346, we find the court used the following language:

"As we understand the law, it is that, for a newspaper to be regarded as a newspaper of general circulation within the county, such a circulation need not necessarily consist exclusively of paid subscribers; that the purpose of the law is clear, namely, that the notice should be inserted in a newspaper which people in this county are likely to read, and that, when the circulation is extensive throughout the county, it makes no difference whether it consists

of paid subscribers or non-paying recipients of the same."

We now go to decisions of courts of other states, the first of which is Pentzel v Squire, 161 Ill. 346. In this case it was held that the Chicago Law Journal Weekly, a newspaper of 16 pages and 12½ inches in length and 10 inches in width and published weekly on Friday of each week, and which circulated among lawyers and laymen, and which contained besides the reports of decisions of the various courts of record, and digest of cases, news of a general nature of current events and of general importance to the public, and which had a weekly circulation of 3875 copies, was a secular newspaper of general circulation within the meaning of the statute.

Another decision by The Supreme Court of Newark, being Hanscom v Meyer, reported in 60 Neb. 68, in which it was held that the Omaha Mercury, a weekly newspaper, circulating among various classes of persons in the county, and devoted principally to legal notices and information regarding courts and court proceedings, though it also contained advertising of a miscellaneous character, literature of a general kind, and a limited amount of general news and current events, was held to be a newspaper of general circulation.

In United States Mortgage Company v Marquam, 41 Or, 391, it was contended that a certain weekly paper was not one of general circulation, because of an immoral tone, prohibited its circulation among respectable people. In this case it was held that its publication was not prohibited by law, but was denied access to the mails, and as it published current news on items of general interest and had a circulation of about 100 copies, it should be assumed that it was read more or less by the general public.

In the case of Lynn v Allen, 145 Ind 584, the question arose whether the newspaper was one of general circulation as required by statute. The paper's circulation was among judges, lawyers, bankers, collection and com-

mercial agencies, merchants, manufacturers and other professional and business men, to the extent of about 550 copies in the City of Indianapolis, Indiana, and outside the city and throughout the state of about 2500. Its news consisted primarily of legal matters including proceedings of the supreme court and appellate court of the state, the various federal, state, county, and city courts sitting in Indianapolis, the trial calendars of the various courts, an account of any suits filed, proceedings of board of public works and other matters relating to street improvements, a list of deeds, etc. Such a paper was held to be one publishing intelligence of a general character. In its opinion the supreme court says: "by a newspaper of general circulation the legislature certainly did not intend a newspaper read by all of the people of the county".

In the case of Ruth v Ruth, 39 Ind. App. 290, the question was the sufficiency of a nonresidence notice of a divorce action which was published in the Morganton Truth, a newspaper printed in Morganton, Indiana. A statute required that all notices should be published in a newspaper of general circulation in the county. The Morganton Truth had a circulation of about 520 copies in the county of 5000 population. Two-thirds of the circulation was in the town of Morganton, and the rest was scattered over the various townships. The paper consisted of four pages of six columns each. It contained local news of the county, correspondence, and general news. The court, holding it to be a paper of general circulation as required by the statute, said: "No fixed number of subscribers is required to constitute general circulation. A newspaper's circulation does not necessarily mean that it is read by all the people of the county or the townships."

In Kerr v Hitt, 75 Ill. 51, the question arose as to the sufficiency of the publication of the notice by which some of the defendants were brought into court. It was contended that the Chicago Legal News, in which the notice was pub-

lished, was not a "secular newspaper of general circulation". It is none the less a newspaper because its chief object is the publication of legal news. Many newspapers published in this and other countries are devoted chiefly to special interests, such as religious and political newspapers, others devoted exclusively to literature, that contain advertisements, news items, personal and political, brief notices of matters of special public concern, and reference to proceedings of legislative and other public bodies. So it is with this journal. Besides legal, it contains other items of news, not only connected with the bench and bar, but others of a general interest.

Our attention has also been called to the case of Burak v Ditson (Iowa) 220 N. W. page 227, the first syllabus of which is as follows

"Syllabus 1. Whether a newspaper is one of general circulation within the meaning of a statute requiring publication in a newspaper of general circulation is a matter of substance and not of size."

"Syllabus 3. A newspaper which, though of particular interest to a particular class of persons, contains news of a general character and interest to the community, though limited in an amount, qualifies as a newspaper of general circulation within the meaning of a statute requiring publication in a newspaper of 'general circulation'."

We also find other cases supporting this general proposition as follows:

Hessler v Coldron, 29 Okla. 216.

Puget Publishing Company v Times Printing Co., 33 Wash. page 551.

Labor Journal 190 Cal. page 500.

We find from the testimony of two of the officers of the Jewish Chronicle that its circulation was between 1500 and 1800 in Franklin County. We find further from the testimony that the circulation was confined to paid subscriptions, with the exceptions that advertisers receive the paper as a part of their advertising fee. The testi-

mony also discloses that the greatest extent of the circulation of this newspaper was among the Jewish population, but several hundred went to non-Jewish persons, such as building and loan companies, city libraries, state library, University library, and many prominent Protestant Ministers in the community.

At to the character of the news, counsel for the mover asked the following question

"Q. Now do I understand your editorial policy is one inserting in your paper general news of all kinds?

A. Whatever affects the community. For instance, the Community Fund Campaign. About a month ago we had a story on the Community Fund that doesn't pertain to the Jewish people but all the people of the community."

The court asked the witness the following question:

"Q. Does your paper publish news which is ordinarily called world news?

A. Yes.

Q. Do you publish any information or news which is ordinarily classified as national news or affairs?

A. Yes, every week.

Q. What news gathering agencies do you have, or of what news gathering agencies do you get the benefit?

A. It is the world wide service which gathers news not only for the daily press but for weeklies as well.

Q. Do you use that service?

A. Yes, also the J. T. A. which supplies the news to the dailies as well as to the weeklies."

By agreement of the parties, the officers of The Jewish Chronicle submitted a number of their issues chosen at random from their files. The Court has examined these issues and find a larger portion of the news items and other matters discussed pertaining to Jewish people and Jewish institutions and interest. But, in addition thereto, we find most excellent editorials. An editorial appeared in the issue of October 7, 1938,

in which it was urged that all the people support the Community Fund Campaign. There was also a message from Senator Bulkley to the Jewish people of Columbus. There were advertisements for housekeepers. There is another two-column article entitled "Hollywood Merry-Go-Round", which is of interest to all persons. Also an article announcing a new kind of beer. We also find articles announcing a series of concerts by The Womens Music Club for the year 1938-1939. We also find theatrical advertisements and comments upon them. We also find comments on the 1938 Civic Concert Series.

In the issue of August 12, 1938, we find an editorial entitled "Symbol of Freedom". Although this is directed to the cause of the Jew, it is certainly of general public interest. We also find various articles, one advertisement, regarding a Veteran's night, one news item entitled "Britain May Abandon Partition in Favor of New Scheme". We also find the column "Hollywood Merry-Go-Round", as well as news of the theatres.

Upon examination of the other copies submitted, we find news of more general character, the greater portion of which is probably of interest to the Jewish population of the county, but we find many other topics which are of general interest.

The question therefore is, whether or not The Jewish Chronicle is a paper of general circulation within the county. As we have heretofore ▮▮▮▮▮ observed, the amount of circulation or the number of subscribers is of much less importance than the nature or character of the news contained in the publication. It would be difficult for this court to lay down a rule by which the general character of the circulation of the paper would be determined by the number of its subscribers. Should a court attempt to lay down such a rule it would be usurping a legislative rather than a judicial function. In our ▮▮▮▮▮ opinion, the rule stated in the Huffman case

above quoted is the rule that should be applied. Taking the opinions of the courts of Ohio, the opinion of Attorney General Hogan hereinbefore referred to, as well as the opinions of other courts outside of Ohio, we are compelled to come to the conclusion that the Jewish Chronicle is a newspaper of general circulation in Franklin County, Ohio, that the publication of the notice complained of has been made according to law, and that by reason thereof the motion will be overruled.